UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| ASHLEY COUCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18 CV 46 DDN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Ashley Couch for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff Ashley Couch, born October 4, 1986, applied for SSI benefits on January 11, 2015. (Tr. 10, 177). She later alleged a disability onset date of January 28, 2015, due to depression, anxiety, post-traumatic stress disorder (PTSD), Wernicke-Korsakoff syndrome,[1] Wernicke's encephalopathy,[2] vision related impairments, and vertigo. (Tr. 10, 30, 181).

---

[1] Wernicke-Korsakoff syndrome is a brain disorder that combines two separate conditions caused by vitamin B1 deficiency: Wernicke's encephalopathy and Korsakoff

On August 26, 2015, plaintiff requested a hearing before an ALJ. (Tr. 10). On February 1, 2017, the ALJ heard testimony from plaintiff and Vocational Expert (VE) Denise Weaver. (Tr. 27-48). On August 23, 2017, the ALJ found that plaintiff was not disabled. (Tr. 7-20). On April 20, 2018, the Appeals Council denied plaintiff's request for review. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

Plaintiff was born on October 4, 1986. (Tr. 177). Plaintiff visited Dr. Syed Imam of Arthur Center Community Health regularly for treatment from May 2014 to September 2016, with two to three month intervals on average between each visit. (Tr. 275-96, 325-61).

Plaintiff made her first visit to Dr. Imam on May 6, 2014. At the initial meeting, plaintiff said she was hospitalized for six days in 2008 for suicidal thoughts, anorexia and bulimia, severe malnutrition, and related brain damage. She complained of her anxiousness, especially in a crowd, and her mood swings. She shared her history of post-partum depression after her son's birth, nervous breakdowns, and three years of sexual abuse by her stepfather from the ages of 9 to 12. Dr. Imam diagnosed her with PTSD, anxiety, eating disorder, and depression. Dr. Imam noted anxious and depressed mood, anxious affect, fair eye contact, and slurred speech. (Tr. 297-301).

---

syndrome. Although they are two related disorders, some scientists believe that they are different stages of the same disorder, which is Wernicke-Korsakoff syndrome. Wernicke's encephalopathy results in symptoms like mental confusion, vision problems, and lack of muscle coordination. Korsakoff syndrome is a memory disorder associated with difficulty of acquiring new information or memories. Wernicke's encephalopathy marks the "acute" phase of the disorder and Korsakoff's syndrome, "chronic" stage. *Wernicke-Korsakoff Syndrome Information Page,* NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/Disorders/All-Disorders/Wernicke-Korsakoff-Syndrome-Information-Page. (last visited on Apr. 9, 2019).

[2] *See supra,* note 1.

She visited Dr. Imam again on July 8, 2014, with symptoms and diagnosis mostly similar to the May 6, 2014 initial visit, except that Dr. Imam recorded, "She has [a] major [a]nger problem." Dr. Imam also noted she had an irritable mood and only fair eye contact, but appropriate affect, normal speech, logical flow of thought, and concrete thought content. (Tr. 275-79). Plaintiff's next visit was on October 14, 2014, and her symptoms and mental status determinations were identical to those of May 6, 2014. (Tr. 283-90).

Plaintiff visited Dr. Imam again on January 13, 2015. This visit marked some changes in plaintiff's symptoms, because plaintiff described herself as: "[o]verall I am stable." While Dr. Imam noted evident irritability and fair eye contact, plaintiff's affect, speech, and thought were in the normal range. At the same time, plaintiff complained of feeling sad, loss of interest, a sense of guilt, choking, and heart racing. (Tr. 291-96).

On March 28, 2015, consultative examiner Kathrina Alexander, M.D., examined plaintiff. Dr. Alexander observed that plaintiff was able to sit, stand, walk, and bear light burdens, and that she was able to touch her toes, squat, rise from a chair, and mount and dismount the examination table without assistance. Also, Dr. Alexander observed that plaintiff had poor balance. (Tr. 315).

On April 6, 2015, plaintiff was seen by consultative examiner Thomas J. Spencer, Psy.D. Dr. Spencer concluded that plaintiff appeared to be capable of understanding and remembering simple instructions and engaging in and persisting with simple tasks. However, he found she was moderately to markedly impaired in her ability to interact socially and adapt to the environment. In his opinion, plaintiff "did not appear capable of managing her benefits without assistance." (Tr. 324).

Shortly thereafter, plaintiff visited Dr. Imam on April 14, 2015, stating that overall, she was "not doing good." (Tr. 355). She asked for adjustment in her medication. This time, Dr. Imam diagnosed plaintiff's mood differently than in previous visits. In addition to anxious mood and fair eye contact, he found her to have depressed and labile mood, labile and anxious affect, pushed speech, flow of thought marked with loose associations, and anxieties and somatic concerns in thought contents. (Tr. 355, 359-60). Dr. Imam's

3

notes from plaintiff's visit on July 14, 2015, are almost identical to those of April 14, 2015. (Tr. 349-54, 355-60).

At her October 6, 2015 visit, plaintiff started by saying that "I got a [*sic*] bad news." Her mother was diagnosed with stage III breast cancer. Dr. Imam noted plaintiff "was improving and has less anxiety but now it is rough and emotional" and she was very anxious and her emotions were "all over the place." Dr. Imam's diagnosis of her mental status added "worthless" to her thought content. (Tr. 343-48).

On March 8, 2016, Dr. Imam's description and diagnosis of plaintiff's symptoms were almost identical to that of the October 6, 2015 visit. (Tr. 337-42). On June 28, 2016, plaintiff claimed to be a "support crew" to her grandfather and her mother, both of whom were suffering from cancer. Also, she stated her medications mostly help her, but sometimes she thinks "her body is adjusting or immune to the doses and it can happen." (Tr. 331). Her last visit to Dr. Imam took place on September 13, 2016, when she said she continued to act as a "support crew" to her mother and grandfather. (Tr. 325).

In addition to Dr. Imam's treatment, plaintiff received counseling services and training sessions to develop coping mechanisms, which she initiated on her own on September 30, 2014, at Family Circle Therapeutic Services. She attended 21 sessions from September 30, 2014, to September 23, 2015. According to the Treating Source Statement from the institution, she successfully worked through her relationship issues with her mother, utilized identified strategies to assist in managing her anxiety attacks, set firmer boundaries in regard to her son's father, and found herself in a position of being able to help both her mother and grandfather in a caregiver role when they were struggling with cancer. Her affect was good when she was in her sessions and she denied any ideation of harm to others. Plaintiff ceased counseling on her own, because she felt that her anxiety and depression were in a manageable range and that she had to take care of her mother and grandfather. (Tr. 362-63).

On July 19, 2017, ten months after plaintiff's last visit with him, Dr. Imam submitted a medical source statement in a check-box format. According to the statement, plaintiff is diagnosed with PTSD, eating disorder, bulimia, obesity, and Wernicke-

Korsakoff syndrome. In Dr. Imam's opinion, plaintiff would be "off-task" for 25% or more to perform even simple tasks. He marked that she is more than mildly limited (either moderately limited, markedly limited, or extremely limited) on 14 out of the 20 tasks listed, except for short and simple ones. There were some that were marked as extremely limited, such as the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to travel in unfamiliar places or use public transportation. Dr. Imam summarily noted his diagnoses and conclusions were drawn based on medical history, clinical findings, diagnosis, and treatment. (Tr. 373-74).

### III. ALJ HEARING EVIDENCE

**A. Plaintiff's Testimony**

Plaintiff testified to the following during the hearing before the ALJ. She currently lives with her mother and three-year-old son in a mobile home. (Tr. 37). She is a high school graduate. (Tr. 39). Her son does not attend any day-care or preschool, so he is at home with her during the day. She answered in the affirmative when asked by the ALJ whether she is "primarily the one that's responsible for taking care of him." She also stated that her mother helps as well, and they "kind of work together," with her mother feeding or changing him. (Tr. 37). Due to her symptoms, plaintiff testified she saw Dr. Imam at the Arthur Center and a counselor, Angie, at the Family Circle. (Tr.35). Plaintiff has taken Zoloft to treat her eating disorder, anxiety, and depression. (Tr. 35).

Plaintiff testified that she last worked in 2007, as a part-time nurse's aide for a couple of months. She has not had any full-time job in the last 15 years, as of 2017. She attributes her inability to work a full-time job to anxiety, depression, Wernicke-Korsakoff syndrome, PTSD, and her inability to lift, all of which affect her daily. Wernicke-Korsakoff syndrome in particular has affected her balance and vision, so she is unable to

run or even lift a bag of sugar if it is heavier on one side, and she often suffers from distorted eyesight. Also, her PTSD and anxiety from childhood sexual abuse limits her ability to focus, concentrate, and be in crowds, and she refers to herself as claustrophobic. (Tr. 31-34). She testified she has a "bad day" at least two or three times a week, when her nerves are "jumping" and she does not even want to take care of her son so that she can sleep. (Tr. 36). She also stated she cannot go grocery shopping by herself without her mother's accompaniment due to her difficulty in interacting with the crowd. (Tr. 38-39). She attributes her inability to drive to her vision impairment and inability to concentrate. (Tr. 40).

**B. Vocational Expert Testimony**

A vocational expert (VE) testified to the following at the hearing. The ALJ posed an initial hypothetical question with two variations, which she termed hypothetical 1-A and 1-B: Assuming an individual of plaintiff's age, education and with no work history, can such a person find a job in the national economy if: (A) the individual can have occasional interaction with the public, co-workers and supervisors, or if (B) the individual can have occasional interaction with co-workers and supervisors but less than occasional interaction with the public? The VE replied that in these two hypotheticals, such an individual could work as a folding machine operator, a garment sorter, or a routing clerk in the clerical industry. (Tr. 42-43).

The ALJ then asked about employer tolerance for what percentage of the day such a person could miss without jeopardizing her employment. The VE testified that missing 10 percent of the day will be tolerated, but 15 percent would not be. The ALJ further inquired how many days a month the person could miss his or her job without employment consequence, and the VE testified that one day would be the maximum. (Tr. 44).

Lastly, the ALJ inquired about the vision requirements of each job. Garment sorter and routing clerks need frequent close-up vision, whereas folding machine operator requires only occasional close-up vision. The ALJ asked for another job meeting either of

the hypotheticals 1-A or 1-B that would require only occasional close-up vision, and the VE identified a shirt folding machine operator in a laundry as another option. (Tr. 45-47).

## IV. DECISION OF THE ALJ

On August 23, 2017, the ALJ issued her decision that since the alleged onset date of January 28, 2015, plaintiff was not disabled under Title XVI of the Social Security Act. (Tr. 11-20). At Step One of the five-step sequential evaluation process, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. At Step Two, the ALJ found that plaintiff suffers from the following severe impairments supported by medically accepted evidence: vertigo, history of Wernicke-Korsakoff syndrome, depressive disorder, anxiety disorder, borderline intellectual functioning, and PTSD. (Tr. 12).

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 13). Plaintiff's severity of mental impairments, considered alone and in combination, did not satisfy either "paragraph B" or "paragraph C" criteria. (Tr. 13-15).

At Step Four, based on the consideration of the entire record, the ALJ found that plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R § 416.967(b), except that she could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The ALJ also found that plaintiff must avoid all exposure to dangerous machinery and unprotected heights. The ALJ found plaintiff's work must be limited to simple routine tasks with occasional interaction with coworkers and supervisors and less than occasional interaction with the public, and she should be allowed to be off-task for 10 percent of the workday in addition to regularly scheduled breaks. (Tr. 15). At Step Five, the ALJ found that, considering plaintiff's age, education, work experience, RFC, and VE testimony, there were jobs existing in significant numbers in the national economy that plaintiff could perform. (Tr.19).

In coming to this conclusion, the ALJ determined that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence. (Tr. 16).

With regard to plaintiff's alleged difficulties with vertigo, impaired vision, impaired balance, and limited mobility, the medical evidence of record showed some limitations, but not enough to support a finding of disability. Plaintiff's vision, the Romberg test results, and daily activities were grounds to reach this conclusion. (Tr. 16-17). The ALJ noted that she had no ongoing treatments for her symptoms.

With regard to the plaintiff's mental conditions, the ALJ found no more than moderate difficulties. The ALJ noted that her mental status examinations, treatment history, and daily activities all reflected greater mental capacity than alleged. Furthermore, the ALJ noted plaintiff stopped counseling on her own initiative in September 2015 in part because she felt her anxiety and depression could be managed, and her counselor noted progress with medication and therapy. Plaintiff did not appear to have returned to therapy despite recommendations from her psychiatrist to do so. The ALJ attributed the periods of worsened symptoms to temporary situational stressors. Also, plaintiff had never required emergency psychiatric care for any uncontrolled symptoms after the onset date. (Tr. 17). The ALJ also found plaintiff's daily activities reflected greater physical and mental abilities than alleged. The ALJ noted that plaintiff could care for her young son, ill mother, and ill grandfather, as well as maintain activities of daily living most of the time. (Tr. 17).

After noting the above findings, the ALJ explained how much weight she afforded the opinion evidence. The ALJ assigned great weight to consultative examiner Kathrina Alexander M.D., who gave her opinions in March 2015 about plaintiff's physical limitations and abilities. The ALJ regarded this opinion as consistent with Dr. Alexander's clinical observations. (Tr. 18).

Next, the ALJ gave partial weight to the consultative examiner, psychologist Thomas Spencer. She gave less weight to Dr. Spencer's finding of moderate to marked

8

impairment in social interaction and adaptation ability to her environment, but greater weight to the finding of plaintiff's limited ability to understand, remember and carry out simple instructions and tasks, which she deemed as consistent with clinical observations and plaintiff's range of daily activities. (*Id.*).

The ALJ characterized the opinion of treating psychiatrist Syed Imam, M.D. as meriting "very little to no weight" because Dr. Imam opined plaintiff was markedly to extremely limited in most work-related tasks with 25 percent off-task behavior and absences from work 4 days a month. The ALJ discredited Dr. Imam's findings because he did not cite any specific objective findings in support, and thus the ALJ concluded that his findings "appeared extreme," considering plaintiff's mental status examinations, daily activities, and positive response to conservative medical health treatment. (Tr. 18-19).

## V. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Johnson v. Colvin,* 788 F.3d 870, 872 (8th Cir. 2015). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* (quoting *Cox v. Apfel,* 160 F.3d 1203, 1206-07 (8th Cir. 1998)). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Andrews v. Colvin,* 791 F.3d 923, 928 (8th Cir. 2015).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42

9

U.S.C. § 1382c(a)(3)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); *see also Gregory* v. *Comm'r, Soc. Sec. Admin,* 742 F.App'x 152, 154 (8th Cir. 2018) (describing the five-step process). Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment, and (3) her severe impairment meets or equals a listed impairment. 20 C.F.R. §§ 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. *Pate-Fires*, 564 F.3d at 942. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her past relevant work, the burden shifts to the Commissioner at Step Five. *Id*. At this final step, the Commissioner considers the claimant's RFC in conjunction with her age, education, and work experience to determine if the claimant retains the requisite RFC to perform other work existing in significant numbers in the national economy. *Id.* 20 C.F.R. § 416.920(a)(4)(v).

## VI. DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in the determination of the weight and credibility of the two medical sources: that of the treating physician and the consultative examiner on mental impairments. Plaintiff argues that the ALJ failed to provide good reasons for rejecting the medical opinions of the treating doctor and the consultative examiner, substituted the ALJ's own opinion, and overlooked the consistency of the opinions of the record between the two sources. (Pl.'s Br. at 1-2)

**A. Assessment of the Medical Opinions of Treating Psychiatrist Syed Imam, M.D.**

Medical opinions of treating physicians are given special deference under Social Security Regulations and generally entitled to controlling weight. 20 C.F.R. § 416.927(d)(2). *Merritt v. Astrue*, 609 F. Supp. 2d 850, 863 (E.D. Mo. 2009). However, a treating physician's opinion is not automatically entitled to controlling weight because the record as a whole must be evaluated. *Id.* A treating physician's opinion is entitled to controlling weight only when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. 20 C.F.R. § 416.927; *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). In assigning less than controlling weight to the opinion of a treating physician, the ALJ must give "good reasons" for doing so; good reasons exist where "the treating physician's opinions are themselves inconsistent" or where "other medical assessments are supported by better or more thorough medical evidence". *Chesser v. Berryhill,* 858 F.3d 1161, 1164 (8th Cir. 2017) (citations omitted). Once the ALJ has decided the weight of a medical opinion, the Court's role is limited to review only whether such determination is supported by substantial evidence, not to decide whether the claimant's view of the evidence is supported by substantial evidence. *Western v. Berryhill*, 2017 WL 1407118, at *3 (E.D. Mo. Apr. 20, 2017).

Plaintiff first argues that the ALJ erred by giving "very little or no weight" to the treating source, Dr. Imam. (Tr. 18). Considering the record as a whole, the ALJ properly discounted the medical opinions of Dr. Imam, because plaintiff's symptoms, daily activities, and medical history do not support that she is as limited as Dr. Imam's opinion states.

First, the format of the medical opinion as a checklist undermines the weight to be given, because the opinion is unsubstantiated. While an evaluation in the form of checklist is not "deficient *ipso facto*," *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005), "[t]he checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value." *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001). Indeed, "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory

11

statements." *Piepgras v. Chater,* 76 F.3d 233, 236 (8th Cir. 1996). *See Wildman v. Astrue,* 596 F.3d 959, 967 (8th Cir. 2010) (holding it was proper to discount a medical opinion that consisted of three checklist forms, cited no medical evidence, and provided little to no elaboration); *Thomas v. Berryhill,* 881 F.3d 672, 675 (8th Cir. 2018) (giving little weight to a medical opinion consisting of checked boxes, circled answers, and brief fill-in-the-blank responses without medical evidence and providing little to no elaboration).

Dr. Imam indicated that he based his opinion upon medical history, clinical findings, diagnosis, and treatment, but it contains no reference to any of these sources and consists of only circled checkboxes without any further explanations or citations. Furthermore, the checkbox form questions do not contain an option of "no limitation," and rather begin at "mildly limited," which makes the questionnaire give an incomplete account of plaintiff's symptoms and conditions. (Tr. 373-74).

Beyond the format of the opinion, its substance also does not entitle it to controlling weight, because plaintiff's daily activities and her life experiences do not match the extreme limitations Dr. Imam opined that plaintiff has. In a social security disability case, where an ALJ assigns less than controlling weight to the opinion of a treating source, the ALJ must give good reasons for doing so. *Chesser*, 858 F.3d at 1164. The ALJ found that Dr. Imam's opinions merited little to no weight because they are not supported by plaintiff's 1) mental status examinations, 2) positive response to conservative mental health treatment with no recent reports of side effects, 3) and varied activities of daily living. The ALJ further noted that the treating physician's opinion was largely based on subjective complaints. (Tr. 16-19). In examining each of these four reasons, the Court is persuaded that substantial evidence supports the ALJ's assessment.

First, in contrast to Dr. Imam's medical opinion that plaintiff is markedly or extremely limited in most of her mental capacities, the record as a whole shows that plaintiff's mental status examinations were not so limited. The Eighth Circuit has held that an ALJ may give a treating physician's opinions less than controlling weight when those opinions conflict with evidence on the record. *See Travis v. Astrue,* 477 F.3d 1037,

12

1041-42 (8th Cir. 2007) (finding that a physician's opinion of plaintiff's inability to work contrasted with a medical record two months later noting that plaintiff "feels great."); *Porter v. Astrue,* 227 F. App'x. 530, 537 (8th Cir. 2007) (reasoning that it was proper for an ALJ to give diminished weight to an opinion when it was contradicted by the record as a whole). The ALJ reasoned that plaintiff's mental status examinations correspond with no more than moderate difficulties, because Dr. Imam consistently found plaintiff to have positive attributes, including being alert, oriented, and cooperative with intact grooming and hygiene; a largely appropriate mood and affect; mostly normal psychomotor activity; logical flow of thought, otherwise intact concentration; good working knowledge of social norms; unimpaired long-term memory; and no suicidal or homicidal ideations. (Tr. 16-17). A week before her alleged onset date, on January 13, 2015, plaintiff said, "[o]verall, I am stable." (Tr. 291).

In addition, reports from plaintiff's counselor show that her social interaction skills are not as limited as Dr. Imam's opinion claims. From September 30, 2014, to September 23, 2015, she attended 21 counseling and therapy sessions almost every week. During her counseling and therapy sessions, the therapist noted that situational stressors—her mother's and grandfather's battles with cancer—exacerbated plaintiff's anxiety and depression. However, the counselor noted progress in her management of social relationships. For example, plaintiff successfully worked through her relationship issues with her mother, utilized identified strategies to assist her in managing her anxiety attacks, and found herself in a position of a caregiver to her mother and grandfather. Also, the counselor found her affect was good when she was in therapy sessions. (Tr. 362-363).

Second, plaintiff's treatment history shows that she had a positive response to conservative mental health care and is able to handle her stress, anxiety, and limited social interaction skills with adequate treatments. (Tr.17). In her last two visits to Dr. Imam, despite saying that sometimes she would think her body was adjusting or immune to the doses, plaintiff also reported to Dr. Imam that her medications do help most of the time. (Tr. 325, 331). She stated her medications worked even when she was acting as a

caregiver for three people. (Tr. 325, 331). She did not report any side effects to medications as of 2016. (Tr. 325, 331, 337, 343, 349, 356). Also, with her counselor, plaintiff was improving enough to cease counseling therapy sessions on her own initiative. Plaintiff stated to her counselor that she could quit her therapy sessions because she felt that she had her anxiety and depression in a manageable range and was caring for her mother and grandfather. (Tr. 363). Even with situational stressors, plaintiff was able to manage her depression and anxieties, quit counseling on her own initiative, and assume her caregiver role.

Plaintiff ended treatment with Dr. Imam on September 13, 2016, and the counseling service on September 23, 2015. (Tr. 325, 363). Between September 2016 and plaintiff's receipt of medical source treatment from Dr. Imam in July 2017, there is no medical record of any additional treatment. (Tr. 17). The record is also devoid of any indication that plaintiff needed emergency care since her alleged onset date. The lack of any evidence showing ongoing counseling, psychiatric treatment, or deterioration or change in plaintiff's mental conditions is substantial evidence to support discounting Dr. Imam's opinion. *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), *Frank v. Colvin*, 129 F. Supp. 3d 794, 809 (E.D. Mo. 2015).

Third, and similarly, plaintiff is able to conduct stressful daily activities when compliant with her medication. The Eighth Circuit has held that carrying out a range of daily activities while compliant with prescribed medications overwhelmingly supports a finding that a claimant is not disabled. *Chrismarich v. Berryhill,* 888 F.3d 978, 979 (8th Cir. 2018) (finding that claimant was not disabled because of evidence that claimant cared for his four young children, performed housekeeping tasks, managed the sale of the family's house, and negotiated with builders of a new house, "and he demonstrated his ability to navigate the obvious stresses inherent in those activities when complaint with his prescribed medications.").

Although plaintiff complained of anxiety and depression, she was able to act as a caregiver for two cancer patients, her mother and grandfather. (Tr. 326, 331, 363). She also characterizes herself as a primary caregiver for her young son. (Tr. 37, 206, 321).

14

Furthermore, she is able to carry out a range of daily housekeeping activities. She can make simple meals daily, wash dishes, do the laundry, and clean her house. (Tr. 206-09, 212). She also maintains certain social ties: she visits her boyfriend's family so that they can see her son, visited a counselor almost every week from September 2014 to September 2015, and saw her psychiatrist, Dr. Imam, around every three months. (Tr. 201, 275-96, 325-61, 363). In *Julin v. Colvin,* 826 F.3d 1082, 1087 (8th Cir. 2016), the Eighth Circuit reasoned that preparing meals, reading, playing internet games, meeting with a doctor every four to eight weeks, visiting family and friends a few times each year, leaving the house a few times each week to go shopping and clean houses, and having dinner at a friend's house once or twice a month demonstrated a claimant's ability to complete simple tasks and interact with others on at least a superficial level. Plaintiff is able to do many daily activities on her own and has assumed the onerous responsibility of caring for three people. *See also Thompson v. Berryhill*, 2018 WL 4027049, at *2 (W.D. Mo. Aug. 23, 2018) (concluding claimant was not disabled from the fact that claimant took care of a mentally ill woman, did housekeeping for her, kept doctor's appointments, attended church and utilized Medicaid transportation). This is legally sufficient evidence for the ALJ to rely on in discrediting Dr. Imam's opinion.

     Lastly, the ALJ assigned diminished weight to Dr. Imam because she found his opinions "appeared to be largely based on the claimant's subjective complaints." (Tr. 19). The ten-month gap between Dr. Imam's opinion and the last time he examined plaintiff does not automatically give his opinion less than a controlling weight. As long as Dr. Imam's opinion has clinical support, the length of time elapsed between his last examination and his rendering of his medical opinion does not matter. *See Nishke v. Astrue,* 878 F. Supp.2d 958, 984 (E.D. Mo. 2012). However, Dr. Imam's opinion does not have clinical support. Dr. Imam did not provide specific medical grounds to support his opinion, other than circling the words "medical history," "clinical findings," "diagnosis," and "treatment" as the basis of the opinion. It was reasonable for the ALJ to conclude that Dr. Imam's opinion was based on plaintiff's subjective complaints, and accordingly, the ALJ did not err when she discounted Dr. Imam's opinion. *See Vance*,

860 F.3d at 1120 (holding that an ALJ does not have to give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that the ALJ does not find credible).

**B. Medical Opinions of Consultative Examiner Thomas Spencer, Psy. D.**

The ALJ is not required to accept every opinion given by a consultative examiner, but still has to weigh all the evidence in the record. *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016). "The ALJ must 'give good reasons' to explain the weight given medical opinions, whether by treating or consultative examiners." *Western v. Berryhill*, 2017 WL 1407118, at *3 (citing 20 C.F.R. § 416.927(c)(2)). Generally, the opinion of a consulting physician who examines a claimant once or not at all does not constitute substantial evidence. *Wildman*, 596 F.3d at 967.

The ALJ awarded "lesser weight" to Dr. Spencer's opinion that plaintiff suffered moderate to marked impairment in interacting socially and adapting to her environment. (Pl. Br. 7; Tr. 18). Plaintiff alleges that the ALJ improperly substituted the opinion of Dr. Spencer for her own interpretation of clinical findings. *See Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990). However, the ALJ did not cite her observation of plaintiff during the hearing as a ground for denying disability benefits to her. *Contra Ness,* 904 F.2d at 435 (finding improper substitution when an ALJ cited his own observation that plaintiff did not appear to be depressed or impaired during the hearing to substitute judgments of treating physician). Nor did the ALJ evaluate the treatment method of plaintiff's physicians. *Contra Hendrix v. Astrue,* 2009 WL 2905038 (E.D. Mo. Sept. 8, 2009) *7-8 (holding the ALJ's conclusion that "plaintiff's hospitalizations were not consistent with what one would expect if plaintiff were truly disabled because of mental impairments" is an improper medical opinion). Also, the ALJ considered all the evidence in the record as a whole, including plaintiff's medical history, symptoms and daily activities, and this evidence supports her conclusion. (Tr. 17).

It is true that both Dr. Imam and Dr. Spencer gave opinions consistent with each other, namely, that plaintiff had moderate to marked disability in social interaction and adaptation to the environment, certain deficits like eye contact and mood, and posttraumatic stress disorder. (Tr. 275-77, 283-85, 321-23, 325-27, 331-32, 337-39, 343-345, 349-50, 355-56). Plaintiff cites *Greiner v. Colvin,* 2017 WL 227965 *8 (E.D. Mo. Jan. 19, 2017), in which an ALJ's failure to consider the consistency between opinions of consultative examiner and treating physician was a ground for remanding the case. In *Greiner,* this Court found the consistency in treating and examining sources and the ALJ's rejection of these consistent opinions was not supported by substantial evidence. *Id.* When considering medical opinions, an ALJ has to consider all of the evidence as a whole. *Mabry*, 815 F.3d at 391; *Merritt*, 609 F. Supp. 2d at 785-86. In *Greiner*, this Court remanded the case because the opinions were not only consistent with each other but also supported by underlying evidence, specifically, the claimant's history of multiple suicidal attempts and hospitalizations. *Id.* However, in the current case, unlike *Greiner,* plaintiff never required any emergency psychiatric care in the period following her alleged onset date. Furthermore, between her last visit to Dr. Imam and the ALJ hearing, she did not provide any record showing she was having regular therapy or counseling sessions. (Tr. 17).

The Eighth Circuit does not reject a finding of disability solely based on a failure to seek treatment for a medical impairment, because such failure may be the result of the mental impairment itself. *Hendrix, 2*009 WL 2905937 at *6 (quoting *Jones v. Chater,* 65 F.3d 102 (8th Cir.1995) and *Pate–Fires,* 564 F.3d at 945). However, regarding the ALJ's discrediting of Dr. Spencer's opinion, plaintiff quit counseling on her own initiative, because she felt she could manage her anxiety and depression, and she took care of her mother, grandfather, and son. (Tr. 329, 363). Her decision not to seek counseling is especially notable because she was highly stressed by playing a caregiver role to both her mother and grandfather. (Tr. 329, 334, 363). She was able to withstand this immense stress and fulfilled her caregiver role without the counseling. (Tr. 331, 338, 343). Dr. Spencer's opinion of moderate to marked social skills and adaptation is not consistent

with the record as a whole because, as the ALJ noted, the record contained multiple "clinical observations of cooperative behavior and good working knowledge of social norms or reports of visiting others regularly, caring for sick family members, and grocery shopping." (Tr. 18). The ALJ specifically pointed to the evidence discrediting the opinion.

## VII. CONCLUSION

For the reasons set forth above, the Court concludes the Commissioner's final decision that plaintiff was not disabled is supported by substantial evidence on the record as a whole. The decision of the Commissioner is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 6, 2019.